UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

Kenneth Irish, Denise Marshall, Allen Moore and Scott Stillwell,

Plaintiffs,

v.

BNSF Railway Company, formerly known as Burlington Northern and Santa Fe Railway Company, Burlington Northern Santa Fe Railway Corporation, William Barbee and Francis A. Weber,

Defendants.

Court File No.  08-CV-469-BBC

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR RELIEF FROM JUDGMENT OR ORDER, MOTION TO AMEND OR ALTER JUDGMENT AND MOTION FOR LEAVE TO AMEND COMPLAINT**

---

## INTRODUCTION

This Court has concluded that plaintiffs' failure to comply with Wis. Stat. § 88.87 compelled BNSF's dismissal.  *See* Oct. 21, 2010 Order (October Order).  That statute limits the remedies that property owners supposedly injured by runoff from railroad grades can pursue to inverse condemnation and equitable relief.  Until plaintiffs were shown the courthouse door, they sought neither type of relief.

As a result, the case against BNSF failed as a matter of law.  Yet the most recent attempt to revive the litigation proceeds as if plaintiffs were merely seeking leave to amend the complaint rather than asking for relief from a judgment.  This fundamental procedural blunder renders the substance of plaintiffs' legal arguments irrelevant.  A complaint against a dismissed party cannot be amended, and the showing necessary to secure relief from a dismissal has not been made.

Nearly three years after commencing this lawsuit, plaintiffs deem themselves entitled to circumvent the October Order by reinventing the complaint to make equitable and federal common law nuisance claims. The Federal Rules of Civil Procedure do not condone such procedural machinations. Even if plaintiffs' latest gambit were not procedurally defective, allowing the amendment would be futile and unduly prejudicial. Final disposition of this litigation can no longer be avoided.

## ARGUMENT

### I.   STANDARDS OF REVIEW

Plaintiffs have filed three motions: (1) to alter or amend the Court's October Order pursuant to Fed. R. Civ. P. 59(e); (2) for relief from the October Order pursuant to Fed. R. Civ. P. 60(b); and (3) to amend the already amended (and as to BNSF dismissed) complaint to assert equitable and federal common law nuisance claims.

#### A.   Fed. R. Civ. P. 59(e)

"Rule 59(e) allows the court to alter or amend a judgment if there is newly discovered evidence or an intervening change in the law or if the judgment reflects a manifest error of the law." *Rhodes v. Luy*, No. 08-C-50, 2009 WL 774449, at *1 (E.D. Wis. Mar. 19, 2009). "A 'manifest error' is a 'wholesale disregard, misapplication, or failure to recognize controlling precedent.'" *Id.* (quoting *Oto v. Metro Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000)).

Rule 59(e) relief is appropriate "only when the court overlooked or misunderstood something; it is generally not a vehicle to introduce new evidence or advance arguments that could or should have been presented to the district court prior to judgment." *Id.*

3055639v3

(citing *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir. 1996)); *see also Irish v. Burlington N. Santa Fe Ry. Co.*, 632 F. Supp. 2d 871, 874 (W.D. Wis. 2009) (Rule 59 is "not intended to provide an opportunity to reargue the merits of a case . . . or to submit evidence that could have been presented earlier").

Rule 59(e) was not promulgated "to enable a party to complete presenting his case after the court has ruled against him." *Matter of Reese*, 91 F.3d 37, 39 (7th Cir. 1996). But without ever accusing the Court of manifest error or asserting something new, plaintiffs make arguments and advance theories that could have been presented before BNSF was dismissed.  Such tactics are exactly what Rule 59(b) abhors.

### B.    Fed. R. Civ. P. 60(b)

"Relief under Rule 60(b) is warranted 'only upon a showing of extraordinary circumstances that create a substantial danger that the underlying judgment was unjust.'" *Daniels v. Brennan*, 887 F.2d 783, 790 (7th Cir. 1989) (quoting *3 Penny Theater Corp. v. Plitt Theaters, Inc.*, 812 F.2d 337, 340 (7th Cir. 1987)).  "Rule 60(b)[] may not be used to reopen an adverse decision unless extraordinary circumstances justify that step." *West v. Schneiter*, 485 F.3d 393, 395 (7th Cir. 2007) (citing *Gonzales v. Crosby*, 545 U.S. 524, 536-38 (2005)).

Rule 60(b) relief is restricted to "allow[ing] modification in light of factual information that comes to light only after the judgment, and *could not have been learned earlier*." *Gleash v. Yuswak*, 308 F.3d 758, 761 (7th Cir. 2002) (emphasis added). Nothing about the assertion of the remedies that § 88.87 allows or the specious

3

invocation of federal common law constitutes extraordinary circumstances or information that could not have been learned before BNSF exited this case.

### C.   Fed. R. Civ. P. 15

Although leave to amend the complaint "shall be freely given when justice so requires," "justice may require something less in post-judgment situations than in pre-judgment situations."  Fed. R. Civ. P. 15(a); *Doe v. Howe Military Sch.*, 227 F.3d 981, 990 (7th Cir. 2000) (quoting *Twohy v. First Nat'l Bank*, 758 F.2d 1185, 1196 (7th Cir. 1985)).  Mere inadvertence cannot justify belated pleading changes.  *Guckenberg v. Wis. Cent. Ltd.*, 178 F. Supp. 2d 954, 960 (E.D. Wis. 2001).  Long delays "result[] in a greater presumption against granting leave to amend" as well as increasing the likelihood that "the new claim is being added in a desperate effort to protract the litigation and complicate the defense."  *Id.* (quoting *Glatt v. Chicago Park District*, 87 F.3d 190, 194 (7th Cir. 1996)).  Thus a party seeking to amend after dismissal "had better provide the district court with a good reason to grant its motion."  *Harris v. City of Auburn*, 27 F.3d 1284, 1287 (7th Cir. 1994); *Bressner v. Ambroziak*, 379 F.3d 478, 484 (7th Cir. 2004) (citing cases).

There is no viable action to amend against a party who has already been dismissed unless Rule 59(e) or 60(b) exacting standards are satisfied, which plaintiffs' brief does not even address.  *See id.*; *see also First Nat'l Bank of Louisville v. Continental Illinois Nat'l Bank & Trust of Chicago*, 933 F.2d 466, 468 (7th Cir. 1991).  Thus even if an amendment were allowed, BNSF cannot be called upon to answer the recently conjured up causes of action.  And nothing justifies plaintiffs' delay in asserting new claims

4

against Barbee and Weber.  Plaintiffs do not even purport to rationalize their tardiness.  Rather the amendment is a transparent and, for all practical purposes, an admitted attempt to elude the October Order's terminal effect on this litigation.  "[P]leading is not like playing darts: a plaintiff can't keep throwing claims at the board until she gets one that hits the mark."  *Doe*, 227 F.3d at 990.

## II.   SECTION 88.87

### A.   The October Order Should Stand

Plaintiffs first argue that since Wis. Stat. § 88.87(2) governs actions arising out of railroad right-of-way drainage, "the entire statute should be brought into greater focus."  Pls.' Br. at 15.   Section 88.87(2)(d) supposedly excuses their failure to follow the procedures required by § 88.87(2)(c) because BNSF knew about the claim within three years.  *Id.*  As a result of this knowledge, plaintiffs contend that BNSF should not avoid accountability.  *Id.*  Besides being too late – BNSF has already been dismissed – the argument is legally flawed.

Plaintiffs have not misread Section 88.87(2)(d), but BNSF's dismissal was not exclusively based on the inadequacy of notice.[1]  Section 88.87(2)(c) restricts the remedies to equitable relief and inverse condemnation.  *See* October Order at 8 ("Plaintiffs do not dispute" that  § 88.87 provides the exclusive remedy in cases in which it applies"); *see*

---

[1]      Plaintiffs charge BNSF with advocating "an overly technical reading[] of the statute."  Pls.' Br. at 5.  BNSF has done no such thing.  The thrust of BNSF's motion to dismiss was plaintiffs' disdain for the § 88.87 process, including specifically their failure to make a claim for equitable relief or inverse condemnation – the only remedies countenanced by the statute.  The insinuation that BNSF has not been forthright or was otherwise deceptive lacks merit.  Plaintiffs could have addressed Section 88.87(2)(d) in response to the motion to dismiss; their silence in this regard is their own doing.

*also* Wis. Stat. § 88.87(2)(c).   And regardless of plaintiffs' non-compliance with § 88.87(2)(c)'s procedural and notice requirements, the "more serious problem" was their failure to make inverse condemnation or equitable claims in either the original or amended complaints.  October Order at 7.

Under such circumstances, neither Rule 59(e) nor 60(b) warrants dragging BNSF back into this case.  Extraordinary circumstances have not even been suggested:  the motion raises no factual information or legal developments that were not apparent before the case against BNSF was over.  *Gleash*, 308 F.3d at 761.  Plaintiffs cannot feign being surprised about the remedy ramifications of § 88.87:  their original complaint accused BNSF of violating that very statute.  (Compl. Count I.)

If that were not enough, no manifest error has been posited.  The October Order interpreted and applied § 88.87 and controlling precedent.   Plaintiffs could have presented the causes of action that they now tout from the outset of this litigation. Losing, rather than recent discoveries or judicial missteps, provides the exclusive rationale for the newly contrived legal theories.  *See Rhodes*, 2009 WL 774449, at *1.

This is plaintiffs' second request to amend the complaint.  Like before, this motion attempts to change the case "after the court has ruled against [them]."  *Matter of Reese*, 91 F.3d at 39.  In sum, the showing necessary to set aside the October Order has not been made.  *First Nat'l Bank of Louisville*, 933 F.2d at 468 ("First National had to have a good reason for so belated an amendment.  It had none."); *Bressner*, 379 F.3d at 484 (denying post-dismissal motion to amend for want of "any reason (never mind a *good reason*)" to justify the tardy amendment).

6

**B.      An Amendment Would be Unduly Prejudicial and Hopelessly Futile**

Even if this Court were inclined to allow plaintiffs to recast a case after BNSF's

dismissal, the introduction of claims for equitable relief – injunction and restitution –

would by unduly prejudicial as well as futile.[2]

1.      Undue Prejudice

Plaintiffs offer no explanation for waiting so long to amend.  The reason, however,

is obvious – their old pleadings failed.  But the Court's enforcement of § 88.87 against

plaintiffs' negligence and nuisance causes of action was a foregone conclusion: the

complaint introduced § 88.87 into this litigation, and the statute specifies applicable

procedures and available remedies.  (*See* Compl. Count I.)  Yet before the October Order

plaintiffs never sought to comply with § 88.87 protocol.  Just like with plaintiffs' prior

amendment, this motion seeks to avoid the dispositive effect of a ruling by this Court.

*See Doe*, 227 F.3d at 990 (nothing precluded plaintiffs from pursuing § 1983 action in

original or amended complaints; failure to provide any reason to justify the late

amendment warranted denial of post-dismissal amendment).

---

[2]      Plaintiffs do not seek to add an inverse condemnation claim, but any such action could not survive.  "The standard for determining a violation under [the inverse condemnation statute] is generally the same as that for a taking under art. I, § 13." *Kohlbeck v. Reliance Constr. Co.*, 647 N.W.2d 277, 251 (Wis. Ct. App. 2002).  "Land is 'taken' under the constitution when, among other things, there has been a 'permanent physical occupation.'"  *Id.* (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 428 (1982)).  "There is no taking unless the flooding is permanent.  To be a taking, flooding must constitute an actual, *permanent* invasion of the land, amounting to an appropriation of, and not merely an injury to, the property." *Herr v. State of Wis.*, 717 N.W.2d 853, 2006 WL 1479910, at *5 (Wis. Ct. App. May 31, 2006) (internal citations and quotations omitted).  Plaintiffs' purported injury is premised on an extraordinary and singular weather event in July 2007.  Runoff from BNSF rail grade has not permanently occupied plaintiffs' property, and they do not contend otherwise.

7

The contention that the Court's recent recognition of § 88.87 procedural requirements and remedy restrictions excuses this untimely amendment amounts to nothing more than a "desperate effort to protract the litigation and complicate the defense." *Guckenberg*, 178 F. Supp. 2d at 960.  Plaintiffs' "mere inadvertence" to realize the exclusive relief available to redress the harm they suffered does not justify this long overdue amendment. *Id.*; *Bressner*, 379 F.3d at 484.

Plaintiffs' inexcusable delay has also denied defendants a meaningful opportunity to scrutinize plaintiffs' damages.  This litigation has languished for nearly three years without any discovery.  But that lapse was not BNSF's doing.  BNSF has "had [anything but] significant time to investigate the nature of the claims."  When defendants attempted to take depositions, plaintiffs went to this Court to prevent all discovery.  [*See* Clerk Doc. No. 31.]  Thereafter plaintiffs manipulated the pleadings in hopes of escaping federal court, which led to a Seventh Circuit appeal and the confirmation of federal jurisdiction.  Hence, delay and discovery avoidance can only be blamed on plaintiffs' procedural machinations.

The passage of time causes memories to dim and evidence to fade.  *See, e.g., Sanders v. Venture Stores, Inc.*, 56 F.3d 771 (7th Cir. 1995) (discussing why undue delays must be avoided).  The timely opportunity to conduct Rule 34 inspections of the property soon after the flood waters subsided has been lost forever.  BNSF would now be forced to take plaintiffs' word regarding soaking that has been repaired and property that has been replaced, rather than seeing firsthand the effects of the high water.

Because of the inherently prejudicial effect of untimeliness, "[w]hen a party unnecessarily waits to bring a motion to amend or supplement his complaint . . . courts are not required to tolerate such delays."  *Schindler v. Marshfield Clinic*, No. 05-C-705-C, 2006 WL 6040783 (W.D. Wis. Nov. 8, 2006) (quoting *Bethany Pharmacal Co., Inc. v. QVC, Inc.*, 241 F.3d 854, 862 (7th Cir. 2001)).  "In delays there lies no plenty."  William Shakespeare, *Twelfth Night*, II 42.  Waiting three years to seek the only remedies allowed by the statute invoked by the complaint cannot be condoned.

2.   Futility

Even if plaintiffs had promptly sought leave to amend, their proposed claims for injunctive relief and restitution fail for futility.  *Bressner*, 379 F.3d at 484; *see also Rodriguez v. United States*, 286 F.3d 972, 980 (7th Cir. 2002) (post-dismissal motions to amend may be denied for futility or undue delay).  Plaintiffs cannot establish any threat of future harm, and their pursuit of "restitution" is nothing more than a common law damage claim in different garb.

Injunctive relief depends upon plaintiffs' ability to show that an injunction is necessary to prevent an irreparable injury.  *See McComb v. Goldblatt Bros.*, 166 F.2d 387, 390 (7th Cir. 1948) (injunctions are designed to deter, not punish); *Kohlbeck*, 647 N.W.2d at 282 (discussing injunction in context of § 88.87).  Past injury does not justify a present injunction; rather equitable relief only issues to prevent a future harm.  *McComb*, 166 F.2d at 390 (injunctions "are not be sued to punish past offenses, but only in a proper case to prevent wrongdoing in the future"); *see also Kohlbeck*, 647 N.W.d at 282; *Fromm & Sichel, Inc. v. Ray's Brookfield, Inc.*, 146 N.W.2d 447 (Wis. 1966).  "The remedy is

9

never afforded on suspicion or on the ungrounded fear that the offense may be repeated in the future." *McComb*, 166 F.2d at 390.

The "common law preference for legal over equitable relief" requires plaintiffs to show that "an injunction is necessary to prevent future harm to their property and that they have no adequate legal remedy." *Kohlbeck*, 647 N.W.2d at 282; *McComb*, 166 F.2d at 390. Plaintiffs have not contended – nor could they, due to the once in several hundred years nature of the July 2007 rainfall – that flooding of equal severity is likely, much less imminent. Speculative concerns are not the stuff of equitable relief. *Id.*

Plaintiffs' pursuit of "restitution" fares no better. Plaintiffs brand the relief sought as restitution, but changing labels does not transform the substance of the recovery. Damages and restitution are two fundamentally different remedies – triggered by distinct circumstances and measured by discrete metrics. *See* 1 Dan B. Dobbs, Dobbs Law of Remedies: Damages, Equity, Restitution § 3.1 ("Dobbs Law of Remedies § 3.1").

"Damages always begins with the aim of compensation for the plaintiff . . . Restitution, in contrast, begins with the aim of preventing unjust enrichment to the defendant." *Ludyjan v. Continental Cas. Co.*, 747 N.W.2d 745, 749 (Wis. Ct. App. 2008) (quoting Dobbs Law of Remedies § 3.1); *Duffy v. Scott*, 292 N.W.2d 273, 276 (Wis. 1940) ("One of the grounds on which the doctrine of Restitution is based is that when one person confers a benefit on another through mistake, whether of fact or law, the other is liable to make restitution."). "To measure damages, courts look at the plaintiff's loss or injury. To measure restitution, courts look at the defendant's gain or benefit." *Ludyjan*, 747 N.W.2d at 749 (quoting Dobbs Law of Remedies § 3.1). If a defendant causes harm

10

without gaining a benefit, then "restitution is not an issue."  Dobbs Law of Remedies § 3.1.

Plaintiffs distort *Bittner v. Sadoff & Rudoy Industries*, 490 F. Supp. 534 (E.D. Wis. 1980), to support of their restitution masquerade.  Pls.' Br. at 7-8.  *Bittner*, however, is easy to distinguish and reflective of why restitution is not what this case is about.  The *Bittner* plaintiff complained about being fired in retaliation for pursuing Employment Retirement Income Security Act of 1974 (ERISA) benefits.  490 F. Supp. at 535-36.  But for the illegal discharge, the employee would have continued to enjoy the emoluments of employment.  Violating ERISA enabled the employer to retain the remuneration to which the former employee was entitled.  Because those benefits had been usurped by the employer, restitution enabled the wronged employee to recover the ill-gotten gains in the form of reinstatement, back pay, and perquisites restoration.  *See id.*

In contrast to *Bittner*, defendants have not retained any benefit conferred by plaintiffs.  Not even plaintiffs contend that defendants gained an advantage from the storm water back up.  In fact, the rushing torrent caused significant damage to the tracks.  Accordingly, plaintiffs' demand to be made "whole" and to recover the value of lost property and the cost of cleanup constitute nothing more than a quest for compensatory damages.  Pls.' Br. at 8.

If plaintiffs' treatment of restitution were accepted, every cause of action seeking to recover property damages could be denominated as an equitable restitution remedy, thereby denying the accused defendant of the constitutional right to the trial of legal claims by a jury.  Plaintiffs cannot maintain an action for either an injunction or

restitution; futility therefore requires that leave to amend plaintiffs'§ 88.87 claims be denied.

### III.   FEDERAL COMMON LAW NUISANCE CLAIM

For the first time in this protracted litigation and contrary to repeated federal implication disavowals, plaintiffs now want to debut federal common law.  Because state common law nuisance and negligence claims are statutorily precluded, plaintiffs turn to federal common law for relief.

As demonstrated in Section II, BNSF has already been dismissed, and plaintiffs' showing does not pass Rule 59(e) or 60(b) muster.  This latest scheme to rescue plaintiffs' case is not premised on the requisite extraordinary circumstances or manifest errors of law sufficient to justify post-judgment relief.  Thus the October Order bell cannot be unrung.

Equally problematic, a federal common law nuisance claim would lack legal viability.  "Federal courts, unlike state courts, are not general common-law courts and do not possess general power to develop and apply their own rules of decision."  *City of Milwaukee v. Illinois*, 451 U.S. 304, 312 (1981).  The reason for this limitation on judicial prerogative is fundamental:  Congress, not the federal judiciary, is constitutionally charged with responsibility for enacting laws of national concern and determining whether state law should be displaced.  *Id.* at 313.

When Congress has not supplanted state law, the federal judiciary must be extremely wary about doing so.  *Id.*  Only "when there exists a 'significant conflict between some federal policy or interest and the use of state law'" are the federal courts

empowered to develop federal common law. *Id.* (quoting *Wallis v. Pan Am. Petroleum Corp.*, 384 U.S. 63, 68 (1966)).  By advocating for a federal common law remedy plaintiffs seek to override the state legislative decision to preclude common law flood damage claims against railroads.  In effect plaintiffs ask this Court to abrogate the policy decision of Wisconsin's democratically elected representatives.

The Class Action Fairness Act, the basis for this Court's jurisdiction, is "an extension of diversity jurisdiction." *In re Burlington N. Santa Fe Ry. Co.*, 606 F.3d 379, 380-81 (7th Cir. 2010).  Federal courts called upon to adjudicate claims pursuant to diversity jurisdiction apply state law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). "There is, of course 'no federal general common law.'" *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640 (1981) (quoting *Erie R. Co.*, 304 U.S. at 78).  Federal common law is resorted to only in the absence of congressional action or presence of a state law conflict with a significant federal interest ramifications. *City of Milwaukee*, 451 U.S. at 313-14.  For that reason federal courts do not generally apply a federal rule of decision, despite the existence of jurisdiction, in the absence of congressional legislation. *Id.* at 313.

Exceptions to this general rule are extremely limited.  As plaintiffs acknowledge federal courts can only fashion common law remedies in two instances:  "those in which a federal rule of decision is necessary to protect uniquely federal interests, and those in which Congress have given the courts the power to develop substantive law."  Pls.' Br. at 9-10 (quoting *Texas Industries, Inc.,* 451 U.S. at 640 (internal citations and quotations omitted)).

3055639v3

1.    No Uniquely Federal Interest

Plaintiffs argue that this dispute presents a "uniquely federal interest" because "[t]his railroad is, at its heart, a federal creation."  Pls.' Br. at 10.  This pronouncement is factually and legally bogus.[3]  The tracks that pass through Bagley, Wisconsin were built by the railroad that ultimately became the Chicago, Burlington & Quincy Railroad Company (CB&Q).  (Lee Aff. ¶ 2.)  The CB&Q and the affiliate that laid the tracks were Illinois and Wisconsin corporations, respectively.  (*Id.*)  When the line was constructed in the late 1880's, the Northern Pacific Railroad (NP) was not involved in the undertaking and had no ownership interest in the rail line.  (*See id.*)

The CB&Q later merged with the NP and the Great Northern (GN) in 1970 to form the Burlington Northern Railroad (BN).  (*Id.* ¶ 4.)  *See, e.g.*, *Burlington N., Inc. v. Am. Ry. Sup'rs Ass'n*, 503 F.2d 58, 60 (7th Cir. 1974).  At the time NP and GN were publicly traded companies, and the government's involvement in the transaction was limited to regulatory approval.  *See*, *e.g.*, *United States v. I.C.C.*, 396 U.S. 491 (1970) (Interstate Commerce Commission authorized merger of pursuant to Section 5 of the

---

[3]    Plaintiffs rely on *Citizens Committee to Save the Land Grant Railroads v. Burlington Northern Inc.* for the proposition that BNSF is a federal creation and therefore a uniquely federal interest must be implicated.  708 F.2d 1430 (9th Cir. 1983).  *Citizens Committee*, however, simply summarizes the Northern Pacific Land Grant Act of 1864, which was nothing more than what the statute's title implies: a land grant act to the Northern Pacific Railroad to provide incentive for the construction of a cross-country railroad.   *Id.* at 1432; *see also Avista Corp. Inc. v. Wolfe*, 549 F.3d 1239 (9th Cir. 2008) (discussing congressional acts "granting public lands to private railroad companies to spur the construction of a cross-country railroad"); *Leo Sheep Co. v. United States*, 440 U.S. 668 (1979) (discussing history of railroad development); *Great N. Ry. v. United States*, 315 U.S. 262 (1942) (same).  The NP's historic roots simply do not transform BNSF into a "federal creation."

Interstate Commerce Act).  BN later merged with the Atchison Topeka and Santa Fe Railroad to form what is now BNSF Railway Company.  (Lee Aff. ¶ 5.)  Until being acquired by Berkshire Hathaway, BNSF was publicly traded and to this day has no association with the federal government – except to be extensively regulated and taxed by various federal agencies.  *See*, *e.g.*, BNSF's Corporate Disclosure Statement, Clerk Doc. No. 2.

The drainage facilities on the tracks adjacent to Bagley are not uniquely federal interests.  Federal interests are piqued "only in such narrow areas as those concerned with the rights and obligations of the United States, interstate and international disputes implicating the conflicting rights of State or our relations with foreign nations, and admiralty cases."  *Texas Industries, Inc.*, 451 U.S. at 641.  This case involves no such circumstances: the rights of the United States as a sovereign are not at issue, different states do not have conflicting interests regarding drainage near Bagley, and admiralty law is not a consideration.

If plaintiffs' view of federal common law were accepted, every case involving a railroad would involve federal common law.  When federal common law is brought to bear state law cannot be used.  *City of Milwaukee*, 451 U.S. at 313, n.7.  Not surprisingly, therefore, plaintiffs cite no cases in which federal common law claims were asserted against railroad facilities or operations.  Instead, federal common law cases usually arise out of interstate water or state boundary disputes.  *Texas Industries, Inc*., 451 U.S. at 641, n.13.

Critically, allowing federal common law to override the remedy limitation of § 88.87 would be inconsistent with the principle of diffusion of power to the states, which promotes democracy in our federal system. *City of Milwaukee*, 451 U.S. at 316 (citing *San Diego Building Trades v. Garmon*, 359 U.S. 236, 243 (1959)). Hence countenancing a federal common law claim would create a federal rule of decision that frustrates the will of the Wisconsin legislature.

2.    <u>Federal Courts Lack Authority to Create Substantive Rules of Law</u>

Congress has not created federal jurisdiction or empowered federal courts to develop governing rules of law regarding localized runoff from railroad rights-of-way. *Texas Industries, Inc.*, 451 U.S. at 642-43. On the contrary, "where Congress has established an extensive regulatory network and expressly announced its intention to occupy the field, federal courts should not create additional rights under the rubric of federal common law." *Cummings by Techmeier v. Briggs & Stratton Retirement Plan*, 797 F.2d 383, 390 (7th Cir. 1986) (declining to recognize federal common law unjust enrichment claim to supplement ERISA enforcement).

Congress enacted the Federal Railway Safety Act (FRSA) to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. The FRSA requires that all laws, regulations and orders related to railroads "shall be nationally uniform to the extent practicable." *Id.* § 20106(a)(1).

Congress has also enacted the Interstate Commerce Commission Termination Act (ICCTA), which has been recognized to effect as all an encompassing displacement of other state and federal laws as can be legislated. *See* 49 U.S.C. § 10501(b) (Surface

16

Transportation Board (STB) has exclusive jurisdiction over "transportation by rail carriers . . . and the construction, acquisition, operation, abandonment or discontinuance of . . . facilities"; these remedies "are exclusive and preempt the remedies provided under Federal or State law"); *Pace v. CSX Transp., Inc.*, 613 F.3d 1066, 1069-70 (11th Cir. 2010) (ICCTA's all-encompassing preemption clause prohibits claimants from circumventing the federal statute so as to allow liability to accrue under state common law). The judicial application of federal common law is by its very nature sporadic and ad hoc, *City of Milwaukee*, 451 U.S. at 324-25 – a process that is contrary to the uniformity of regulation that Congress sought to effect by enacting the FRSA and the ICCTA.

Despite the congressional mandate of national rail transportation system uniformity, plaintiffs insist that federal law supposedly "does not cover the type of nuisance claims created by failing to monitor a natural area within the railroad's right of way." Pls.' Br. at 12. This argument ignores the FRSA, the ICCTA, and the regulations promulgated pursuant to those statutes.

When Congress charges an administrative agency with responsibility for overseeing a complex regulatory scheme, like with interstate rail transportation or interstate water pollution, the federal judiciary is precluded from imposing different or more stringent standards. *City of Milwaukee*, 451 U.S. at 320-21. And unlike the presumption against the preemption of state laws, when Congress legislates a comprehensive regulatory scheme, the courts readily conclude that federal common law must yield. *Id.* at 315, 324 (a statute need "not address every issue of [an area of law], . .

17

. but when it does speak directly to a question, the courts are not free to 'supplement' Congress' answer so thoroughly that the [statute] becomes meaningless"); *see also Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 287 (7th Cir. 1997) ("When Congress has spoken this carefully to the subject of remedies, it would exceed the proper role of the court for us to read in additional or different remedies."); *Cleveland v. Beltman N. American Co.,* 30 F.3d 373, 380 (2d Cir. 1994) (courts "should be reluctant to use federal common law to supplement comprehensive legislation"); *Resolution Trust Corp. v. Gallagher*, 10 F.3d 416, 419 (7th Cir. 1993) ("The relevant question is whether Congress spoke directly to a question, not whether Congress has affirmatively proscribed the use of federal common law").

Plaintiffs' claims are premised solely on BNSF's purported failure to prevent debris and other obstructions from impeding the flow of runoff under the trestle near Bagley, causing the waterway to back-up.  (Am. Compl. ¶¶ 41, 42, 47, 48, 49.)  The FRSA's regulations cover this exact subject matter:

> Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned.

49 C.F.R. § 213.33 (2009).  "Thus, the FRSA evinces a congressional intent and statutory purpose, manifested through regulations, to supplant federal common law." *Waymire v. Norfolk & Western Ry. Co.*, 65 F. Supp. 2d 951 (S.D. Ind. 1999), *aff'd* 218 F.3d 773 (7th Cir. 2000).

The ICCTA similarly prohibits any entity other than the STB from directing how a railroad uses and maintains facilities, including bridge trestles, which are inextricably

intertwined with interstate rail operations.  *See Maynard v. CSX Transp.*, 360 F. Supp. 2d

836 (E.D. Ky. 2004); *Guckenberg*, 178 F. Supp. 2d at 958.  Because the ICCTA speaks

directly to the issue of bridge trestle construction and maintenance – an integral part of

railroad operation – federal courts are not free to supplement regulatory standards with

common law relief.  *See City of Milwaukee*, 451 U.S. at 315.

The comprehensive scheme established by the FRSA and the ICCTA reflects

Congressional intent to put railroad oversight in the hands of expert administrative

agencies, rather than federal judges.  *City of Milwaukee*, 451 U.S. at 317, 325.  And while

the 2007 clarification of the FRSA allows valid state law claims to proceed, subject to a

federal standard of care, *see* 49 U.S.C. § 20106,[4] the availability of a federal common law

action depends upon a finding that "state law cannot be used."  *Id.* at 313 n.7.

Hence, plaintiffs' pursuit of both state statutory and federal common law claims is

inherently inconsistent:  the availability of one form of relief precludes the other.  Federal

courts are loath to preempt state law, but the displacement of federal common law by

congressional legislation is readily accepted.  *City of Milwaukee*, 451 U.S. at 315; *see*

*also Gordon*, 130 F.3d at 286-87 (Carmack Amendment supplanted federal common law

punitive damages claim); *Resolution Trust Corp.*, 10 F.3d at 420-24 (Financial

Institutions Reform, Recovery and Enforcement Act of 1989 displaces federal common

law); *People of State of Ill. v. Outbound Marine Corp., Inc.*, 680 F.2d 473, 479-80 (7th

---

[4]       The 2007 amendments did not overrule long standing precedent (*i.e.*, *CSX Transp.
v. Easterwood*, 507 U.S. 658 (1993)), but instead merely clarified the preemption analysis
to include a compliance component.  *See* H.R. Rep. No. 110-259, at 351 (2007) (Conf.
Rep.), as reprinted in 2007 U.S.C.C.A.N. 119,183.

Cir. 1982) (when Congress has legislated on a subject, there is a "presumption in favor of preemption of federal common law").

*Waymire* is instructive.  A railroad employee was injured in a train-truck collision and brought a Federal Employers' Liability Act (FELA) action.  His negligence based claim charged that the train was going too fast and the warning devices were inadequate. Rejecting argument against the preclusion of federal common law negligence claims, the court explained:

> The regulations do not set minimum safety requirements; rather, the FRSA and its regulations establish the federal safety standards in all areas of railroad safety.  This necessarily includes the safety standards governing the railroads' actions with regard to their employees.  Arguably then, to the extent federal common law would be inconsistent with the FRSA's speed regulations, the FRSA and its speed regulations preclude additional regulation under federal common law.

65 F. Supp. 2d at 956.

The same rationale foreclosed the inadequate warning device claim.  218 F.3d at 777 ("Given that the federal agency empowered by Congress to establish uniform, comprehensive federal safety standards related to warning devices at grade crossings has promulgated such regulations, federal common law and statutes on these issues are necessarily displaced.").  This conclusion is entirely consistent with *City of Milwaukee* which held that federal common law could not be invoked to impose more stringent standards than those promulgated by the agency charged by Congress with administering a comprehensive regulatory scheme.  451 U.S. at 320.

Plaintiffs' federal nuisance theory is premised upon the railroad's alleged failure to properly maintain drainage facilities near Bagley.  The design, construction,

maintenance, and operation of these facilities are comprehensively regulated by the Federal Railroad Administration and within the exclusive jurisdiction of the STB. Thus to the extent any nuisance claim would be inconsistent with applicable FRSA or ICCTA regulation, federal legislation unambiguously precludes any additional or more stringent requirements including those that would be imposed by virtue of federal common law. *Id.* And in like *City of Milwaukee*, the railroad regulatory regime "provides a forum for the pursuit of such claims before expert agencies . . ." *Id.* at 326. Plaintiffs can pursue an administrative complaint about track conditions before the STB. 49 U.S.C. §§ 10501, 11704(c)(1).

Finally, nothing suggests that Congress wanted federal courts to create a body of federal common law to govern disputes over drainage from railroad grades. *Turner/Ozanne v. Hyman/Power*, 111 F.3d 1312 (7th Cir. 1997) (no federal common law absent a statutory directive empowering federal courts to create substantive law governing specific disputes). No case has ever allowed a plaintiff to circumvent a state law restriction on remedies by resorting to federal common law. The reported cases are almost limited to pollution migrating across state lines or fouling interstate water.[5] And

---

[5]     Plaintiffs' reliance on cases in which private parties brought federal common law nuisance claims is to no avail. Pls.' Br. at 10-11. Those cases involved challenges to standing, but the interstate nature of the dispute was not at issue. These plaintiffs complain about the railroad's design, construction, inspection, and maintenance of drainage facilities in Bagley, Wisconsin and nowhere else. The interstate implications of environmental pollution cases were not a consideration when Bagley got wet. Moreover, plaintiffs rely on the dissent in *Nat'l Audubon Society v. Dep't of Water*, 869 F.2d 1196 (9th Cir. 1989), which is obviously not controlling. Pls.' Br. at 11.

once Congress intervenes field even those common law nuisance claims are precluded. *City of Milwaukee*, 451 U.S. at 332.

Because Congress clearly intended to foreclose federal common law actions through the enactment of the FRSA and the ICCTA, no federal common law nuisance claim can be maintained. Simply put, nothing suggests that "Congress has given the courts the power to develop substantive law" regarding drainage from railroad facilities. *Texas Industries*, 451 U.S. at 640. On the contrary, the enactment of the FRSA and the ICCTA show that "the paramount authority of Congress" has been exercised to vest expert administrative agencies with authority to develop appropriate regulations. *City of Milwaukee*, 451 U.S. at 313 (quoting *New Jersey v. New York*, 283 U.S. 336, 348 (1931)).

## CONCLUSION

Plaintiffs' scramble to avoid dismissal comes up empty. The Court's application of § 88.87 constitutes neither a manifest error nor an extraordinary circumstance that could justify relief from the October Order. Plaintiffs' motions should be denied, and as defendants' November 3, 2010 supplemental brief demonstrated, the remaining action against the individual employees should follow suit.

Besides that, the procedural deficiencies, futility and undue prejudice warrant denial of leave to amend. Plaintiffs proffer no justification for this tardy amendment, and as masters of their complaint they must be charged with knowledge of the remedy ramifications of § 88.87 from the outset of this litigation. They cannot state claims for equitable relief: injunctions prevent future harm, and not even plaintiffs contend that the threat of another 500-year rainfall looms. Their claim for restitution is in name only:

22

since no benefit was conferred upon defendants at plaintiffs' expense, the relief sought is in substance compensatory damages – which § 88.87 precludes.

Finally, the limited exceptions to the preclusion of federal common law are not a consideration.  Plaintiffs' claims do not implicate a "uniquely federal interest" and by enacting the FRSA and the ICCTA, Congress vested the Federal Railroad Administration and the Surface Transportation Board, not the courts, with authority to develop substantive law regarding railroad rights-of-way, including drainage from those facilities. Plaintiffs' belated and misguided attempt to save this case is too little, too late.

Dated:  December 8, 2010                    **BRIGGS AND MORGAN, P.A.**


By: *s/Timothy R. Thornton*
    Timothy R. Thornton (#1032018)
2200 IDS Center
80 South Eighth Street
Minneapolis, Minnesota  55402-2157
(612) 977-8400
pvolk@briggs.com

**ATTORNEYS FOR DEFENDANTS**